*Formatted for Electronic Distribution*                                      *For Publication*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF VERMONT

_____

**In re:**

    **Robert S. Hutchins,**                                    **Chapter 13 Case**
                  **Debtor.**                              **# 08-10082**

_____

| *Appearances:* | *Kathleen Walls, Esq.* | *Douglas J. Wolinsky, Esq. and Shireen Hart, Esq.* |
| --- | --- | --- |
| | *Middlebury, VT* | *Primmer Piper Eggleston & Cramer PC* |
| | *For the Debtor* | *Burlington, VT* |
| | | *For the Creditor* |

Filed & Entered
On Docket
January 30, 2009

## MEMORANDUM OF DECISION
### OVERRULING CREDITOR'S OBJECTIONS TO CONFIRMATION

Robert S. Hutchins (the "Debtor") has proposed a Third Amended Plan which treats the claim of Tennessee Commerce Bank ("TCB" or "Creditor") as unsecured, and TCB objects to confirmation asserting that it should be deemed to have a perfected security interest in the Western Star Dump Truck (the "Collateral") it refinanced for the Debtor. TCB argues it was the Debtor's failure to send it the certificate of title for the Collateral that caused its security interest to be unperfected, and therefore, that the Debtor's treatment of its claim as unsecured demonstrates a lack of good faith that warrants denial of confirmation. Alternatively, TCB asks the Court to treat its claim as secured by application of one of three equitable principles.

For the reasons that follow, the Court finds the Debtor's classification of TCB's claim as unsecured is proper, that TCB has failed to prove the plan was not proposed in good faith, and that TCB has also failed to demonstrate a right to relief under any equitable theory. Accordingly, the Court overrules TCB's objections to confirmation of the Debtor's plan.

## JURISDICTION

The Court has jurisdiction over this contested matter, under 28 U.S.C. § 1334; and as a core proceeding, pursuant to 28 U.S.C. § 157(b)(2)(L).

## BACKGROUND FACTS & PROCEDURAL HISTORY

On January 31, 2008, the Debtor filed a bankruptcy petition under chapter 13 (doc. # 1) and a chapter 13 plan (doc. # 5). Schedule F of the petition indicated that the Debtor owed TCB a $99,000 unsecured debt and listed the consideration for that debt to be an "unperfected lien on dump truck." In June 2008, the Debtor filed a Second Amended Plan which, inter alia, listed (under the category of "secured claims") a $30,000 debt secured by a dump truck valued at $75,025, noting that "Tennessee Commerce's secured claim shall be limited to the amount set forth herein notwithstanding any conversion or dismissal of this case. Tennessee Commerce bank shall enter into a new agreement with the Debtor

which reflects this fact within a reasonable time after confirmation." (doc. # 23)

TCB objected to the Second Amended Plan, arguing that the plan was not proposed in good faith and, alternatively, that the Court should apply the doctrine of equitable subrogation or estoppel to prevent the Debtor from depriving TCB of its rightful place as a secured creditor (doc. # 34). In July 2008, the Debtor filed a Third Amended Chapter 13 Plan and a Response to TCB's Objection to Confirmation (doc. ## 36, 37). In his Response, the Debtor contends that: (i) he "came into possession of a 'clean' title through no action of his own" and continued to make payments to the Bank; (ii) in his petition and (original) plan, he had treated TCB's claim as wholly unsecured; (iii) following TCB's filing of an objection, the Debtor negotiated with TCB and filed an amended plan that treated $30,000 of TCB's claim as secured (solely to advance confirmation of the plan), although this came at the expense of the unsecured creditors; and (d) the Debtor has since amended his plan to once again treat the Creditor's claim as wholly unsecured (doc. # 37).

After a confirmation hearing in July 2008, the Court entered a stipulated scheduling order (doc. # 48) which directed the parties to file a stipulated statement of undisputed facts. The parties' stipulated statement provides as follows:

> 1.   On July 18, 2007, the Debtor became indebted to TCB pursuant to a loan in the stated principal amount of $104,831.58 (the "Loan"). The Loan is evidenced by a certain Promissory Note dated July 18, 2007 and made payable by the Debtor to the order of TCB in the stated principal amount of the Loan (the "Note"). The Debtor signed a document entitled Commercial Security Agreement dated July 18, 2007 (the "Security Agreement"), which describes the subject collateral as a 2001 WESTERN STAR 4964 (Serial Number 2WKEDDX121K969235) (the "Property"). True and correct copies of the Note and Security Agreement (sometimes collectively referred to as the "Loan Documents") are collectively attached hereto as Exhibit "A" and incorporated fully herein by reference.

> 2.   At the time that TCB extended the Loan to the Debtor, the Property was subject to a first priority purchase money lien as security for a loan from M & T Credit Services, LLC ("M & T") to the Debtor.

> 3.   As evidenced by the Disbursement Request and Authorization (the "Disbursement Request") issued by TCB in connection with the Loan, $58,164.28 of the Loan proceeds were sent by TCB to M& T upon the closing of the Loan. These proceeds were used to refinance the Debtor's indebtedness to M & T that was secured by the Property. A true and correct copy of the Disbursement Request is attached hereto as Exhibit "B" and incorporated herein by reference.

> 4.   Upon M & T's receipt of the proceeds from TCB, M & T sent the original Certificate of Title to the Property (the "Certificate of Title") to the Debtor.

> 5.   M & T sent the Certificate of Title to the Debtor with a notation and signature meant to release its lien in and to the Property.

> 6.   Upon receipt of the Certificate of Title from M & T, the Debtor was aware he was in possession of the Certificate of Title.

> 7.   As of January 31, 2008, which was the date the Debtor filed his petition for relief (the "Petition Date"), the Debtor was in possession of the Certificate of Title.

8.   The Debtor remains in possession of the Certificate of Title to the Property.

9.   The Debtor did not send, nor offer to send, the Certificate of Title to TCB prior to the Petition Date.

10.  TCB did not request the Certificate of Title from the Debtor prior to the Petition Date.

11.  Prior to the Petition Date, the Debtor did not send the Certificate of Title to the Vermont Department of Motor Vehicles for processing of the release of M & T's lien in and to the Property and for the notation of TCB's lien in and to the Property on the Certificate of Title.

12.  M & T's lien in and to the Property remains notated on the Certificate of Title. [1]

(doc. # 52).   The Debtor subsequently filed his own Statement of Facts, to supplement the joint

statement:

1.   On or about July 18, 2007 the Debtor obtained a loan from Tennessee Commerce Bank ("TCB") with the intention of paying M & T Credit Service ("M & T") in full. It was not clear to him that by signing the documents, he would be creating a security interest in the 2001 WESTERN STAR 4964 ("WESTERN STAR").

2.   In late July or early August 2007, when a copy of the title to the WESTERN STAR was sent to the Debtor in the mail, he put it in an envelope with other important documents and put it on a shelf in the corner. The Debtor did not call anyone or question why the title had been sent. He assumed TCB did not use the WESTERN STAR as collateral for the loan.

3.   The Debtor was not aware of any obligation to send the title to TCB.

4.   At no time did TCB ever contact the Debtor to request anything relating to the title.

(doc. # 53). TCB replied by filing its Opposition to Debtor's Statement of Facts, asserting four additional

factual and legal arguments:

1.   The Bank does not dispute that the Debtor obtained a loan from the Bank with the intention of paying M & T Credit Service ("M&T") in full. The Bank opposes the Debtor's statement that it was not clear to him that by signing the documents, he would be creating a security interest in the 2001 Western Star 4964 ("WESTERN STAR"). Individuals are charged with constructive knowledge of the contents of the documents they sign. Consolidated Edison Co. v. U.S., 21 F.3d 362, 371 (2d Cir. 2000).

2.   The Bank does not dispute that when the Debtor received the copy of the title to the WESTERN STAR he "put it in an envelope with other important documents and put it on a shelf in the corner." Likewise, the Bank does not dispute that the Debtor did not call anyone or question why the title had been sent. The Bank does oppose the assertion that the Debtor assumed that the Bank did not use the WESTERN STAR as collateral for the loan. "Where the language of the agreement is clear, the intention and understanding of the parties must be taken to be that which their agreement declares." Lamoille Grain Co. v. St. Johnsbury & Lamoille County Railroad, 369 A.2d 1389, 135 Vt. 5 (1976) (citation omitted).

---

[1] This fact seems to be at odds with the Debtor's statement that he received a "clean" title from M & T Bank. The Court accepts the statement contained in the stipulated facts, rather than the Debtor's statement in his response to the Bank's Objection to Confirmation (doc. # 37).

3.    The Bank opposes the assertion that the Debtor was not aware of any obligation to send the title to the Bank. Ignorance of the law "excuses no one, and corresponding presumptions that every one is conclusively presumed to know law apply in Vermont in both civil and criminal cases…" State v. Woods, 107 Vt. 354, 179 A. 1 (1935).

4.    The Bank does not oppose the assertion that pre-petition it did not contact the Debtor "to request anything related to the title."

(doc. # 57).

## LEGAL ARGUMENTS

TCB claims that the Debtor has not proposed his plan in good faith, pursuant to 11 U.S.C. § 1325(a)(3), because it is a plan that allows the Debtor to have it both ways: having reaped the benefit of his bargain with TCB, he "may not now assert a technical rule of law to avoid the term of his bargain when compliance with the rule of law was made impossible by the debtor's failure to register the vehicle" (doc. # 34 p. 5). TCB argues that under Vermont state law, specifically 23 V.S.A. § 2043(1), the owner of a motor vehicle (here, the Debtor) is required to execute a certificate of title application naming the lienholder (here, TCB) and to deliver that application to that lienholder. There is no dispute that the Debtor had possession of the certificate of title or that the Debtor did not deliver the certificate of title to TCB. TCB insists that the Debtor's failure to deliver the certificate of title to TCB caused its security interest not to be noted on the certificate of title. According to TCB, the Debtor "thwarted TCB's efforts to perfect its lien" in the Collateral and he should therefore be estopped from denying that TCB has both a properly perfected security interest and a secured claim equal to the value of the Collateral. To support its argument, TCB cites In re Rule, 38 B.R. 37 (Bankr. D.Vt. 1983) where this Court (Marro, J) held that a debtor who did not register a motor vehicle had "thwarted" the effort of the bank to have its lien recorded on the certificate of title, and was consequently estopped from denying the validity of the bank's lien (doc. # 34, pp. 4-6). TCB's other argument is that it should be equitably subrogated to M & T's lien in the collateral because the Debtor's failure to comply with his statutory obligations to TCB would otherwise allow him to reap a windfall and be unjustly enriched at TCB's expense (citing In re Chateauguay Corp.,89 F.3d 942, 947 (2d Cir. 1996) and Norfolk & Dedham Fire Ins. Co. v. Aetna Casualty & Surety Co., 132 Vt. 341, 343 (1974)).

In response, the Debtor denies any intent to deprive the bank of its legal rights. He says he borrowed money from TCB to pay M & T Bank the remaining balance on his truck loan; after the closing, TCB sent a check to M & T to pay the loan in full and thereafter M & T sent him the truck title with a notation and signature releasing the M & T lien; the Debtor came into possession of this "clean" title through no action of his own; thereafter, the Debtor made payments to TCB, which never asked him for the certificate of title or, as far as he knew, took any steps to perfect its security interest prior to the date

4

he filed his bankruptcy petition (doc. # 37).[2] The Debtor argues that, under 23 V.S.A. § 2042, in order to

perfect a security interest in a motor vehicle one must deliver to the Commissioner of Motor Vehicles an

application, fee, and certificate of title indicating the lienholder; and that this is the exclusive means of

perfecting a security interest in a motor vehicle. He emphasizes that since the application was not deliv-

ered to the Commissioner with the title and fee, TCB's security interest was never perfected, TCB's claim

is unsecured, and the Debtor's failure to sign the application is irrelevant (doc. # 37). The Debtor also

points out that TCB cannot remedy its defective security interest by invoking equitable subrogation

because TCB was not liable to M & T Bank, and because TCB's extension of funds was voluntary. Id.

## DISCUSSION

The Court will address TCB's two objections seriatim.

### I.       Was the Plan Proposed in Good Faith?

A.       The Pertinent Statutes and Case Law

Analysis of the good faith argument encompasses both state and federal statutes. The key Vermont

statutes address how to perfect a security agreement and the duties that arise upon creation of a security

interest. 23 V.S.A. § 2042, entitled "Perfecting security interest," provides, in relevant part:

> (a)  Unless excepted by section 2041 of this title (not applicable here], a security in-
> terest in a vehicle of a type for which a certificate of title is required is not valid
> against creditors of the owner or subsequent transferees or lienholders of the vehicle
> unless perfected as provided in this subchapter.

> (b)  A security interest is perfected by the delivery to the commissioner of the exist-
> ing certificate of title, if any, an application for a certificate of title containing the
> name and address of the lienholder and the date of his or her security agreement and
> the required fee. It is perfected as of the time of its creation if delivery is completed
> within 20 days thereafter, otherwise as of the time of the delivery.

Section 2043, entitled "duties on creation of security interest," provides, in relevant part:

> If an owner creates a security interest in a vehicle:

> (1)  The owner shall immediately execute the application, in the space provided
> therefore on the certificate of title or on a separate form the commissioner prescribes,
> to name the lienholder on the certificate, showing the name and address of the lien-
> holder and the date of his or her security agreement, and cause the certificate, the ap-
> plication and the required fee to be delivered to the lienholder.

> (2)  The lienholder shall immediately cause the certificate, the application and the
> required fee to be mailed or delivered to the commissioner.

Vermont case law is unequivocal that compliance with 23 V.S.A. §§ 2042 and 2043 is the "exclu-

sive" method of perfecting and giving notice of security interests. Northfield Savings Bank v. Nicholls (In

re Covey), 470 F. Supp. 1049, 1050 (D.Vt. 1979). In Covey, the District Court held that because a bank

---

[2]  From the record before the Court, it appears that it was M &T's failure to send the "clean" certificate of title that precipitated
the unfortunate series of events that culminated in TCB lacking a perfected security interest on the date of the Debtor's
bankruptcy filing, and there is nothing in the record to show what steps, if any, TCB took to address the issue with M & T.

failed to apply to the Department of Motor Vehicles for a certificate of title at the time the funds underly-ing the lien were advanced, it did not have a perfected security interest, even though the bank was errone-ously listed on the certificate of title (from a prior financing transaction). There is an exception, however, for clerical errors after delivery of the certificate of title to DMV. This Court (Conrad, J.) has held that if a DMV employee errs in processing the application or issuing the certificate of title, the lienholder will be protected and "the burden of a clerical error should not fall on the filing creditor." In re Farnham, 57 B.R. 241, 247, 248 (Bankr. D.Vt. 1986).

The question of whether a plan presented in a bankruptcy case has been proposed in "good faith" begins with § 1325(a) of the Bankruptcy Code.  That statute establishes good faith as one of the essential elements of a confirmable plan and provides:

> § 1325 Confirmation of plan.
>
> (a)  Except as provided in subsection (b), the court shall confirm a plan if—
>
>> * * *
>>
>> (3)    the plan has been proposed in good faith and not by any means forbidden by law

11 U.S.C. § 1325(a)(3) (2009). As our sister bankruptcy court has observed, applying this good faith requirement in chapter 13 requires a Court to take many factors into account:

> A good faith determination focuses on the "totality of the circumstances" in deter-mining whether the debtor displayed "honesty of intention," and "requires a bank-ruptcy court to 'inquire whether the debtor has misrepresented facts in his plan, un-fairly manipulated the Bankruptcy Code, or otherwise proposed the plan in an ineq-uitable matter." In re Klevorn, 181 B.R. 8, 10 (Bankr.N.D.N.Y.1995); In re Johnson, 708 F.2d 865, 868 (2d Cir.1983) (citations omitted). . . . Courts have found bad faith in Chapter 13 cases in the following circumstances: . . . the debtor's pre-petition con-duct was improper. . .

In re Plagakis, 2004 WL 203090 at * 4 (E.D.N.Y. Jan. 27, 2004).

   B.      Application of the Pertinent Statutes and Case Law

As mentioned above, TCB asserts that, as a result of the Debtor's failure to comply with the Vermont statute that required him to name TCB on the certificate of title and deliver that certificate to TCB, it was unable to deliver the certificate, application and fee to the commissioner and was thereby unable to perfect its security interest in the Collateral. Having been deprived of a properly perfected security interest by the Debtor, TCB claims the Debtor acted in bad faith by treating its claim as unse-cured in the plan. 23 V.S.A. § 2043)(1) clearly placed a duty on the Debtor to send the certificate of title to TCB and, as TCB points out, the Debtor's ignorance of the law is no excuse. In its assessment of the totality of the circumstances, the Court considers the Debtor's pre-petition failure to comply with this statutory requirement as a factor weighing against the Debtor's good faith filing of his plan.

At the same time, the Court must also consider TCB's duties, role in the underlying transaction,

6

and pre-petition actions when focusing on the totality of the circumstances. TCB advanced funds to M & T Bank to satisfy M & T's lien against the Collateral. The Court presumes that all parties intended and expected that M & T would release its lien and send the "clean" certificate of title to TCB so it could perfect its security interest. As a matter of fact, the Vermont statutes imposed such an obligation on M&T with respect to the certificate of title:

> Upon the satisfaction of a security interest in a vehicle for which the certificate of title is in the possession of the lienholder, he shall, within ten days after demand and, in any event, within thirty days, execute a release of his security interest, in the space provided therefore on the certificate . . . and mail or deliver the certificate and release to the next lienholder named therein. . .

23 V.S.A. § 2045(a).

At some point shortly after the closing on the loan, TCB knew – or should have known – that it had not received the certificate of title from M & T. As a sophisticated commercial entity that lends money and perfects security interests in the regular course of its business, TCB was ultimately responsible for ensuring that its security interest was perfected. See, e.g., NetBank, FSB v. Kipperman (in re Commercial Money Center, Inc), 350 B.R. 465, 486 (9th Cir. BAP, 2006) (holding that appellant bank "is a sophisticated commercial entity and nothing prevented it from verifying that financing statement had been filed, for from taking possession of the leases.") TCB should have, at the very least, contacted the Debtor to request that he send it the properly completed certificate of title, so that TCB could perfect its security interest. If TCB had made such a request of the Debtor, and if the Debtor had refused, TCB could legitimately point to the Debtor as having thwarted its effort to perfect its lien and its bad faith argument would have some teeth. However, the stipulated facts indicate that TCB did not contact the Debtor to request the certificate of title at any time during the six months that elapsed between the Debtor receiving the certificate of title (in early August 2007) and filing for bankruptcy relief (on January 31, 2008).

The Court finds the case of Remes v. Ford Motor Credit Co. (In re Churchwell), 80 B.R. 855 (Bankr. W.D. Mich. 1987), and cases cited therein, instructive. In Churchwell, a certificate of title erroneously listing no secured party was issued to the debtor; six months later the debtor filed for bankruptcy; and the chapter 7 trustee filed a complaint against the finance company seeking a determination that the company's security interest in the debtor's vehicle was not perfected. The court held that the finance company's security interest was unperfected and subordinate to the trustee's lien creditor status. In the course of its analysis, the Churchwell court examined a number of other decisions, the holdings of which pertain to the issue presented here. One group of decisions stands for the proposition that the secured party bears the burden of taking reasonable steps to perfect its security interest, and "[a]bsent a significant effort to perfect its security interest, fraudulent intent by the debtor, or an uncooperative debtor, the secured party bears the risk of unperfected status when its security interest is not properly registered as a matter of public record." Churchwell, 80 B.R. at 859 (citing In re Trim-Lean Meat Products, Inc., 10 B.R.

333, 335 (D.Del.1981) and <u>In re Flynn</u>, 6 U.C.C.Rep.Serv. 1119, 1121 (E.D.Mich.1969)). In <u>In re Park</u>, 22 U.C.C.Rep.Serv. 1074, 1980, also cited in <u>Churchwell</u>, a debtor had obtained a new title that errone-ously failed to disclose the first secured party and the creditor had taken no action to correct the title. The <u>Park</u> court observed that the creditor, which had experience in "the purpose, necessity and manner of perfection," should not have "assigned the responsibility of correcting the error to a debtor when [the creditor] was in the business of financing vehicles" and therefore held that the creditor's interest was unperfected. <u>Churchwell</u>, 80 B.R. at 859 citing <u>Park</u>. With respect to a concept quite relevant here, <u>Churchwell</u> also cited <u>Roost v. Green Tree Financial Servicing Corp. (In re Stoerck)</u>, 227 B.R. 548, 552 (Bankr. D.Or. 1998) for the statement that "[a] party is not relieved of the duty to take certain steps to perfect its security interest simply because another party declines to cooperate."

The Court considers these cases as it ponders which party, the Debtor or the Creditor, should bear the brunt of the financial consequences that were set into motion when M & T mistakenly sent the clean certificate of title to the Debtor and ended with TCB not having a perfected security interest on the petition date. The stipulated facts do not reveal any intentional effort on the Debtor's part to thwart the Bank's security interest. At worst, the Debtor was negligent in not knowing and not following the dictates of the Vermont statute, and negligence does not constitute bad faith. <u>Cf.</u> <u>In re Harris</u>, 464 F.3d 263, 270 (2d Cir. 2006) (noting that under Fed. R. Bankr. P. 8001, bad faith and negligence are two distinct find-ings); <u>American Bankers Ins. Co. of Florida v. Northwestern Nat. Ins. Co.</u>, 198 F.3d 1332, 1336 (11th Cir. 1999) (in insurance context, "simple negligence cannot be enough to establish bad faith"); <u>In re Chang</u>, 2007 WL 1232055 *4 (N.D. Cal. Apr. 26, 2007) (affirming bankruptcy court's finding that although documents and testimony "contained discrepancies arising to 'negligence,' debtor's lack of 'attention to details' did not constitute bad faith").

While the conduct of both the Debtor and TCB contributed to TCB's unsecured status as of the pe-tition date, the question before the Court is whether the totality of the circumstances indicates that the Debtor did not propose his plan in good faith. Taking into account the relative sophistication of the parties, the various failures of each party to fulfill their statutory and commercially reasonable duties, and the fact that there is no evidence of any fraud or malicious intent by the Debtor, the Court finds that TCB has not demonstrated that the totality of the circumstances warrants a finding that the Debtor failed to propose his plan in good faith. The Court therefore overrules that aspect of TCB's objection.

**II.     May TCB's Claim Be Deemed Secured by Application of Either Equitable Subrogation or Equitable Estoppel?**

A.     <u>Equitable Subrogation and Equitable Estoppel under Bankruptcy and State Law</u>

TCB argues that its claim should be deemed secured under either equitable subrogation or equita-ble estoppel. The Court finds these arguments to be without merit. The availability of relief under these two equitable principles is extremely limited and TCB has failed to establish the facts that would warrant

8

such relief.

      Bankruptcy Code § 509 authorizes equitable subrogation, but that provision, entitled "Claims of codebtors" is clearly inapplicable here because there is no co-debtor on the TCB debt.

      Although TCB does not cite it in particular, its equitable estoppel argument seems to invoke concepts more often associated with equitable subordination, and hence the Court addresses that principle directly. A bankruptcy court's ability to subordinate a claim under principles of equitable subordination is set out in § 510(c):

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> > (1)    under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
> >
> > (2)    order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). "The concept of equitable subordination, as developed by case law, is that a claim may normally be subordinated only if its holder is guilty of some misconduct. It is a remedial, not a penal, measure that is used only sparingly." 4 Collier on Bankruptcy, ¶ 510.05[1] (15th ed. 2008). This Court has had occasion to address this principle and explained it as follows:

> Equitable subrogation arises in equity to prevent fraud or injustice and usually arises when (1) the paying party has a liability, claim or fiduciary relationship with the debtor; (2) the party pays to fulfill a legal duty or because of public policy; (3) the paying party is a secondary debtor; (4) the paying party is a surety; or (5) the party pays to protect its own rights or property.

Lawlor v. Chittenden Trust Co. (In re Lawlor), 2005 WL 4122833 * 2 (Bankr. D.Vt. Dec. 15, 2005) (citing Black's Law Dictionary 1440-41 (7th ed. 1999)). "This equitable doctrine, which has as its goal the advancement of justice and the prevention of injustice, is used 'only in extreme cases bordering on if not reaching the level of fraud.'" Rouse v. Chase Manhattan Bank, U.S.A. (In re Brown), 226 B.R. 39, 44 (W.D.Mo. 1998) (quoting Kansas City Downtown Minority Dev. Corp. v. Corrigan Assoc. Ltd. P'ship, 868 S.W.2d 210, 223 (Mo.Ct.App. 1994)).

      The state law jurisprudence on these equitable remedies likewise reflects the need for courts to apply them sparingly. In Norfolk & Dedham Fire Ins. Co. v. Aetna Casualty & Surety Co., 132 Vt. 341, 318 A.2d 659 (1974), the Vermont Supreme Court explained how equitable subrogation operates under state law:

> Subrogation is an equity called into existence for the purpose of enabling a party secondarily liable, but who has paid the debt, to reap the benefit of any securities or remedies which the creditor may hold against the principal debtor and by the use of which the party paying may thus be made whole. It is a doctrine which has particular approval in Vermont as between insurer and insured. Subrogation arises when one man is compelled to pay a debt for which another is primarily liable and which, in

good conscience, should have been discharged by the latter. Subrogation is an equity creature akin to and derived from the law of unjust enrichment and restitution.

The general rule is that an obligor or insurer making a payment for which it is not liable is making a 'voluntary' payment and cannot be subrogated. Although the general rule has not been applied specifically to insurance law by Vermont, the rule is applied in Vermont to general equitable rights of subrogation and restitution.

It is not disputed by the parties that one is a volunteer if he pay while under no obligation to pay or when no interest of his is protected by payment. The problem presented is determining what is a 'volunteer' in any particular factual situation.

Equity rules are not absolute and competing equities must be considered in any subrogation-restitution situation. The subrogee must have clear equity and subrogation is defeated by countervailing equities. Subrogation will not be enforced to the prejudice of equal or higher rights.

Id. at 343-44, 346; 318 A.2d at 661-62 (citations omitted).

    B.          Application of Equitable Subrogation and Equitable Subordination to the Facts at Bar

TCB asserts that it "sent funds to M & T in an amount sufficient to satisfy M & T's lien in the collateral but, due to the Debtor's failure to comply with his statutory obligations owed to TCB, the Debtor stands to reap a windfall and be unjustly enriched at the expense of TCB unless TCB is allowed to 'step into the shoes' of M & T" (doc. # 34). TCB seeks an order of this Court declaring that TCB is equitably subrogated to M & T's lien and that TCB holds a fully perfected and secured first priority lien against the Collateral in an amount equal to the funds it sent to M & T in connection with the closing of the loan ($58,164.28). (Id.). The Debtor responds that equitable subrogation is not applicable here because TCB was not liable to M & T, was not compelled to pay M & T, and extended funds to the Debtor voluntarily. The Debtor concludes that equitable subrogation is not available to TCB as a means of establishing itself as a secured creditor in this case (doc. #37).

The Court finds the Debtor's arguments on this point to be persuasive, and concludes that TCB may not rely upon the doctrine of equitable subrogation to remedy its failure to perfect its lien against the Collateral prior to the date the Debtor filed for bankruptcy relief. Although the Debtor signed a disbursement request and authorization, that document was, as it was entitled, a request and an authorization; it was not a document that compelled TCB to pay M & T or which guaranteed the perfection of TCB's security interest. The determinative and undisputed fact is that TCB did not take even the most obvious commercially reasonable steps to perfect its lien.  Significantly, it failed to place an obligation on the Debtor to deliver the certificate of title to TCB or to follow up with the other parties to the transaction when it did not have the certificate of title several months after the closing. It would be inequitable for TCB to benefit from an equitable remedy when its own conduct contributed significantly to the quandary it finds itself in.

TCB also implores the Court to apply the doctrine equitable estoppel to the facts presented in order to transform its infirm security interest to a valid one. It reasons that the Debtor should be estopped

from treating TCB's claim as unsecured because its unsecured status is the direct result of the Debtor's bad faith conduct, citing the <u>Rule</u> case as support for this relief. However, the holding in <u>Rule</u> is inapposite. First, TCB points to no case that holds that the facts underlying estoppel, found in <u>Barton Savings Bank & Trust Co. v. Helen Bickford, et al.</u>, 97 Vt. 166, 174, 122 A.582 (1923), and relied upon in <u>Rule</u>, would be equivalent to the lack of good faith required for denial of confirmation under § 1325(a)(3). Second, TCB has not specified how the estoppel analysis in <u>Rule</u> would apply here. The <u>Rule</u> court makes a number of equitable arguments to support its holding, but does not apply the recognized four-part test for equitable estoppel established by Vermont case law. Third, although the <u>Rule</u> court cited an equitable subrogation case, <u>Libco Corp. v. Charles W. Leigh (In re Reliable Mfg. Corp.)</u>, 17 B.R. 899 (N.D. Ill. 1981) in its estoppel discussion, TCB has not articulated whether or how the doctrine of subrogation fits into its estoppel argument. Fourth, the <u>Rule</u> case is factually distinguishable from the case at bar in that the creditor in <u>Rule</u> delivered an application concerning its lien to the DMV Commissioner, whereas here, TCB did not make or deliver an application.

Additionally, in examining all of TCB's prayers for equitable relief, the Court must consider the impact that granting such relief would have on other parties. To elevate TCB's claim to secured status would work to the prejudice of the unsecured creditors. Equitable relief will not be granted if doing so would have the result of harming other parties. This specific point was addressed in <u>Sheehan v. Valley National Bank (In re Shreves)</u>, 272 B.R. 614 (Bankr. N.D.W.Va. 2001) where a creditor sought to be treated as a secured creditor, notwithstanding its lack of a perfected security interest, to protect its lien from avoidance by the chapter 7 trustee. There, the creditor had engaged in a vehicle refinance with the debtors, and due to an initial one-month delay by the debtors and a subsequent one-month delay by the creditor, the creditor's lien was not perfected until a date that fell within the preference period. The court enunciated several bases for rejecting the creditor's arguments against the trustee, including a rationale under §§ 544, 547, and then turned to the creditor's equitable subrogation argument.  It ruled:

> Further, even if the Court found the right of equitable subrogation to be consistent with the Bankruptcy Code, it would not find subrogation under the facts of the instant case. 'Subrogation will never be permitted where it causes injustice or works to the prejudice of third parties.' [citation omitted] To allow [the lender] to sidestep a preference avoidance when it perfected its lien four months after executing the security agreement would work to the prejudice of all unsecured creditors.

<u>Shreves</u>, 272 B.R. at 622. Likewise, if this Court were to compel the Debtor to ignore TCB's unperfected security interest and treat TCB's claim as secured, that secured claim would be paid at the expense of the unsecured creditors.

Lastly, bankruptcy jurisprudence urges courts to scrutinize the conduct of a creditor seeking equitable subrogation relief vis a vis the conduct of others involved in the transaction, when determining whether to grant that relief. For example, although facing slightly different factual circumstances, the

court in <u>Brown</u> denied equitable relief, notwithstanding the severe consequences on the moving party. There, the trustee sought to avoid a creditor's lien on a refinanced mobile home on the ground that the lien was perfected within the 90-day preference period. The creditor argued that its lien should be equitably subrogated to the properly perfected lien of the entity that financed the original transaction because its tardiness in perfection was caused by the original lender's failure to release its lien within 10 days (as required by the applicable Missouri statute). The <u>Brown</u> court found that the statute offered no relief to a subsequent lienholder when the original lienholder failed to execute a release of lien upon its satisfaction. The court reasoned that the transferred funds "could have been escrowed until [the original lienholder] executed the lien release." <u>Brown</u>, 226 B.R. at 43. It also placed significant weight on the fact that the lien remained unperfected for over two months. <u>Id.</u> at 43-44. Ultimately, the court rejected the creditor's request that it use its "equitable power [under 11 U.S.C. § 105(a)] to override the fact that [the defendant creditor] perfected its lien within the preference period." <u>Id.</u> at 44. As this Court does today, the <u>Brown</u> court refused to rescue the creditor through the application of the equitable subrogation doctrine, notwithstanding that another entity had failed to follow a state perfection statute, when the creditor seeking relief did not do all that it should have done to perfect its interest. <u>See</u> <u>also</u> <u>Vermont Federal Credit Union v. McGrath (In re McGrath)</u>, 2005 WL 1030424 (Bankr. Vt 2003), where a creditor intended to take a lien on a truck but inadvertently sent a clean certificate of title to the debtor. The creditor then objected when the debtor treated its claim as unsecured in a chapter 13 case filed two weeks thereafter. This Court held that under Vermont law, the fact that the creditor's delivery of the certificate of title was a simple mistake did not save the creditor's security interest because "the intent of the lienholder is irrelevant." <u>Id.</u> at *2. Essentially, equitable remedies must be granted sparingly, and are not available to those who contributed to their economically disadvantageous situation and failed to take reasonable steps to avoid or correct the situation.

After consideration of the facts presented, the entire record before it, and the pertinent state and federal law, the Court finds that TCB has not demonstrated a right to equitable relief and overrules the portion of its objection seeking to have its claim treated as secured under the equitable doctrine of subordination, subrogation, or estoppel.

<u>CONCLUSION</u>

For the reasons set forth above, the Court overrules all objections to confirmation interposed by Tennessee Commerce Bank, and will enter an Order confirming the Debtor's Third Amended Plan.

This constitutes the Court's findings of fact and conclusions of law.

_____
January 30, 2009                                          Colleen A. Brown
Rutland, Vermont                                         United States Bankruptcy Judge

12